IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA
PITTSBURGH

SEUBERT & ASSOCIATES, INC., A )
PENNSYLVANIA CORPORATION; AND )
TEAM TEN LLC d/b/a AMERICAN )                    2:20-CV-01880-MJH
EAGLE PAPERMILLS, )
)
            Plaintiffs, )
)
        vs. )
)
THE AMBASSADOR GROUP LLC, d/b/a
AMBASSADOR CAPTIVE SOLUTIONS
AND BRANDON WHITE;

            Defendants,

OPINION

Plaintiffs, Seubert & Associates, Inc. (Seubert) and Team Ten LLC (AE Paper), bring the

within action against Defendants, the Ambassador Group LLC and Brandon White, alleging

Defendants failed to provide agreed upon services to implement an insurance captive program.

(ECF No. 24).   Seubert, the only Plaintiff in Count III of the Amended Complaint, moves for

summary judgment on said count. (ECF No. 33).  Defendants also move for summary judgment

as to all of Plaintiffs' claims.  (ECF No. 35).  These matters are now ripe for consideration.

After consideration of Seubert and Defendants' Motions for Summary Judgment (ECF

No. 33 and 35), all briefing (ECF Nos. 36, 38, 40, 42, 44, and 45), Concise Statements of

Material Facts and Responses (ECF Nos. 37, 39, 41, and 43), the relevant pleadings, and for the

following reasons, Seuberts' Motion for Summary Judgment will be denied; and Defendants'

Motion for Summary Judgment will be granted in part and denied in part.

I.        Background

    Seubert is an insurance brokerage firm based in Pittsburgh, Pennsylvania. (ECF No. 39

at ¶ 6).   In 2015, Brian Long ("Long"), the current chairman and past president of Seubert, first

met Brandon White, Ambassador's president.  *Id*. at ¶¶ 1 and 6.  After meeting Mr. White,

Seubert and Ambassador began a working relationship, wherein Ambassador provided education

and information regarding insurance captives to Seubert and to Seubert's insurance agents. *Id*.

This involved educational information about the mechanics of captive insurance, including "what

captives are, where captives work, and where captives do not work."  *Id*.

In general, captive insurance programs can enable businesses to control insurance

pricing over time, reduce insurance premium costs, more effectively manage risks, obtain tax

advantages, and secure insurance coverage where such may not otherwise exist within the

traditional insurance market. *Id*. at ¶ 4.

AE Paper is a Pennsylvania based paper-making company and client of Seubert. *Id* at   ¶

8.  For over 130 years, AE Paper had procured property insurance coverage from Factory Mutual

Global ("FM Global").  *Id*. at ¶ 9.  In the summer of 2019, FM Global informed AE Paper that

they were exiting "that line of business"; whereupon AE Paper's premiums for property

insurance coverage would triple, making it economically unfeasible for AE Paper to purchase

future coverage from FM Global.  *Id*. As a result, AE Paper requested Seubert to procure

insurance coverage from another source. *Id*. Mr. Long and Brian Seltzer, representatives of

Seubert, attempted to find alternative primary property insurance coverage for AE Paper.  *Id*. at ¶

10.  Mr. Seltzer negotiated with fifty-two insurers to provide AE Paper's primary property

insurance; however, all declined to provide coverage.  *Id*.  Seubert next suggested that AE Paper

engage Ambassador to consult about the possibility of creating a captive insurance company.  Id.

at ¶ 11.

On September 6, 2019, AE Paper entered into a Captive Services Agreement

("Agreement") with Ambassador. *Id*. at ¶ 12.  Section 3 of the Agreement provides:

> Ambassador will perform services for AE Paper described in Addendum A and B
> of this Agreement. It is anticipated, based on Ambassador's experience, that
> services under this Agreement will be performed on the schedule provided in
> Addendum B . . . . Ambassador's report and recommendations will be solely for
> the information of AE Paper. . . . Only AE Paper is entitled to rely on
> Ambassador's report and recommendations . . . . None of Ambassador's services
> or recommendations should be regarded as legal, tax, or accounting advice and
> AE Paper is encouraged to consult its own legal, tax and accounting advisors. AE
> Paper should consult such legal, tax, or accounting advisors early in the process to
> facilitate timely completion of services.

(ECF No. 24-1 at p. 2). Addendum A outlines two phases of work to be provided by Ambassador

to AE Paper under the Agreement: (1) Feasibility; and (2) Implementation. *Id*. at pp. 8-9.

Paragraph 4 of the Agreement provides:

> For services described in Addendum A, AE Paper agrees to pay Ambassador a fee
> for $50,000. The fee will be fully-earned and payable to Ambassador upon which
> AE Paper's acceptance of the terms and conditions set forth in this Agreement.

*Id*. at p. 3.

Ambassador asserts that it takes six to nine months to complete the "Feasibility" and

"Implementation" phases for a client.  (ECF No. 39 at ¶ 13). AE Paper requested an expedited

timeline, given their immediate need to replace their property coverage insurer.  *Id*.  In an

effort to accommodate AE Paper, Ambassador agreed to perform both phases in an estimated

ninety (90) day period.  *Id*. AE Paper selected a captive approach that would best align with its

business needs, whereupon Ambassador began working on the "Implementation" phase of the

Agreement.  *Id*. at ¶ 17.

On or about February 20, 2020, Ambassador delivered written terms of the proposed

captive program to AE Paper. *Id*. at ¶ 23.  On March 3, 2020, Ambassador obtained and bound

property insurance within the appropriate coverage limits for AE Paper.  *Id*. at ¶ 23.  On March

5, 2020, Ambassador sent Seubert a binder of insurance, indicating $13 million dollars in

coverage bound for AE Paper.  (ECF No. 24-6).   In addition, AE Paper's coverage binder provided that the $13 million policy coverage would also yield a $523,000 Loss Fund for AE Paper.

Ambassador asserts that, on April 8, 2020, First Insurance Funding, on behalf of AE Paper, sent $948,690 in premium costs for insurance coverage to EC3 Brokers in London. However, AE Paper's captive insurance company was not formed, because Ambassador was unable to obtain licensing from the Cayman Island Monetary Authority (CIMA).  Licensing was refused because of allegations against Ambassador contained in a lawsuit filed in the United States District Court for the Western District of Kentucky, Louisville Division, *Lexington Insurance Company v. The Ambassador Group LLC, et al.*, Case No. 3:20-CV-330-BJB (Lexington Lawsuit).

After becoming aware of the Lexington Lawsuit against Ambassador, Seubert directly contacted EC3 Insurance Brokers of London to confirm whether the $13 million dollars in insurance coverage had actually been procured for AE Paper. (ECF No. 24 at ¶ 36).  Seubert then learned that AE Paper had only been issued $6.5 million dollars of coverage and that of the $948,690.00 paid for premiums, exactly $600,000.00 was paid to underwriters, which secured coverage of $6.5 million, only half of the $13 million that AE paper had paid for. Also, the Loss Fund was only $348,690.00, not the $523,000.00 expected by Seubert and AE Paper. *Id*.  When Seubert discovered that Ambassador had not met the terms of the Agreement, Seubert immediately paid $266,200.00 to purchase an additional $6.5 million dollars in insurance coverage to obtain the $13 million insurance coverage that AE Paper expected it had purchased.  *Id*. at ¶ 60.

Shortly after Seubert voluntarily purchased the additional insurance coverage for AE

Paper, Brian Long, on behalf of Seubert, contacted Mr. White.   Mr. Long suggested that

Seubert be paid $600,000 as a means of recouping monies Seubert paid for AE Paper's

insurance coverage. (ECF No. 36-2 at p. 20).  Mr.  White agreed to pay $300,000 to Seubert to

satisfy Defendants' alleged breaches; however, ultimately, the $300,000 was not paid.

Defendants contend that this agreement was conditioned upon securing financing for $300,000,

which neither Mr. White nor Ambassador was able to do. *Id*. at pp. 14-15.

In Count I of the Amended Complaint, AE Paper sues for breach of contract, alleging

that, after it paid Ambassador $50,000.00 for its services, Ambassador breached the

Agreement, when it failed to form the insurance captive.  In Count II, AE Paper sues for Breach

of Contract, alleging that Defendants also breached the Agreement when it failed to procure

$13 million dollars in property insurance for AE Paper through an off-shore insurance captive;

and, as a result, AE Paper suffered $349,310.00 in damages. The damages consisted of (a) the

difference between the premium quote, $425,690.00, and the actual cost, $600,000.00, to

procure insurance coverage, and (b) the difference between the Loss Fund quote, $523,000.00,

and the actual return, $348,000.00, that was returned to AE Paper, plus significant damages for

attorney fees, lost time, and reductions in its credit line.  In Count III, Seubert alleges a breach

of contract claim, whereby it claims damages of $266,200.00 that it paid to secure an additional

$6.5 million in insurance to total $13 million in coverage for AE Paper. Seubert also alleges

that Mr. White and/or Ambassador agreed to pay Seubert, $300,000.00 to settle Seubert's

claims; however, such was not paid.  In Count IV, AE Paper and Seubert claim fraud and fraud

in the inducement, alleging that Defendants misrepresented material facts and induced AE

Paper to enter into the Agreement with Ambassador to form and manage AE Paper's offshore

captive, and to obtain insurance for AE Paper. In Count V, AE Paper and Seubert claim fraud

and fraud in inducement against Defendants, alleging that Defendants unlawfully converted Plaintiffs' funds for purposes not provided for within the Agreement and not intended by the parties. In Count VI, AE Paper claims Defendants converted its property, namely $50,000, for Defendants' own use and benefit. In Count VII, AE Paper and Seubert asserts a punitive damage claim, alleging the Defendants' actions were willful, wanton, and carried out in a gross manner, which was in total disregard for the financial well-being of Plaintiffs.

Defendants move for summary judgment as to all counts, and Seubert only seeks summary judgment as to Count III.

II.    Standard of Review

According to Federal Rule of Civil Procedure 56, a court must grant summary judgment where the moving party "shows that there is no genuine dispute as to any material fact" and the moving party "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). For a dispute to be genuine, there must be "a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party." *Moody v. Atl. City Bd. of Educ.*, 870 F.3d 206, 213 (3d Cir. 2017) (internal quotations omitted). Additionally, for a factual dispute to be material, it must have an effect on the outcome of the suit. *Id.* In reviewing and evaluating the evidence to rule upon a motion for summary judgment, the court must "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the" non-moving party. *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 265 (3d Cir. 2014) (internal quotations omitted). However, where "the non-moving party fails to make 'a sufficient showing on an essential element of her case with respect to which she has the burden of proof,'" the moving party is entitled to judgment as a matter of law. *Moody*, 870 F.3d at 213 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

6

"The movant has the burden of showing that there is no genuine issue of fact, but the plaintiff is not thereby relieved of his own burden of producing in turn evidence that would support a jury verdict." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). "Discredited testimony is not normally considered a sufficient basis for drawing a contrary conclusion. Instead, the plaintiff must present affirmative evidence in order to defeat a properly supported motion for summary judgment." *Id.* at 256-57 (internal citation omitted). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249-50 (internal citations omitted). Judges are not "required to submit a question to a jury merely because some evidence has been introduced by the party having the burden of proof, unless the evidence be of such a character that it would warrant the jury in finding a verdict in favor of the party." *Id.* at 251 (internal citation omitted).

III.   Discussion

A.   Counts I and II-Breach of Contract

1.   Defendant Brandon White-Counts I and II

Defendants argue that Brandon White cannot be liable for breach of contract under Counts I and II because he is not a party to the Agreement. Specifically, Defendants contend that Ambassador and AE Paper are the only parties to the Agreement. Accordingly, Defendants maintain that Plaintiffs cannot prove the existence a valid contract between Mr. White and AE Paper. Plaintiffs respond that, given Mr. White's alleged offer to pay Plaintiffs' $300,000 on behalf of himself and Ambassador for damages arising out of the Agreement, a jury could determine that Mr. White was acting as an alter ego of Ambassador in the formation of the Agreement.

Ambassador is a Kentucky Limited Liability Company founded by Mr. White in 2011.

Mr. White has served as Ambassador's president since that time.  Kentucky law governing limited liability companies grants immunity from personal liability as follows:

> (1)     Except as provided in subsection (2) of this section or as otherwise specifically set forth in other sections in this chapter, no member, manager, employee, or agent of a limited liability company, including a professional limited liability company, shall be personally liable by reason of being a member, manager, employee, or agent of the limited liability company, under a judgment, decree, or order of a court, agency, or tribunal of any type, or in any other manner, in this or any other state, or on any other basis, for a debt, obligation, or liability of the limited liability company, whether arising in contract, tort, or otherwise. The status of a person as a member, manager, employee, or agent of a limited liability company, including a professional limited liability company, shall not subject the person to personal liability for the acts or omissions, including any negligence, wrongful act, or actionable misconduct, of any other member, manager, agent, or employee of the limited liability company. That a limited liability company has a single member or a single manager is not a basis for setting aside the rule otherwise recited in this subsection.

> (2)     Notwithstanding the provisions of subsection (1) of this section, under a written operating agreement or under another written agreement, a member or manager may agree to be obligated personally for any of the debts, obligations, and liabilities of the limited liability company.

> (3)     Subsection (1) of this section shall not affect the liability of a member, manager, employee, or agent of a limited liability company for his or her own negligence, wrongful acts, or misconduct.

Ky. Rev. Stat. Ann. § 275.150.  Under alter ego/veil piercing principles, the Kentucky Supreme Court has held:

> The current formulation boils down to "two dispositive elements: (1) domination of the corporation resulting in a loss of corporate separateness and (2) circumstances under which continued recognition of the corporation would sanction fraud or promote injustice.

*Inter-Tel Techs., Inc. v. Linn Station Properties, LLC*, 360 S.W.3d 152, 165 (Ky. 2012).[1]

To assess separateness, courts consider a "laundry list" of factors:

> (1) inadequate capitalization; (2) failure to issue stock; (3) failure to observe
> corporate formalities; (4) nonpayment of dividends; (5) insolvency of the
> debtor corporation; (6) nonfunctioning of the other officers or directors; (7)
> absence of corporate records; (8) commingling of funds; (9) diversion of
> assets from the corporation by or to a stockholder or other person or entity to
> the detriment of creditors; (10) failure to maintain arm's-length relationships
> among related entities; and (11) whether, in fact, the corporation is a mere
> facade for the operation of the dominant stockholders.

*Id*. at 163–64.

Here, under the plain reading of the Agreement, Mr. White was not a party to this
contract. The preamble of the Agreement clearly defines AE Paper and Ambassador as the sole
parties to the contract. Mr. White's name only appears in his capacity as president/founder of
Ambassador. (ECF No. 24-1 at p. 9). Nothing within the Agreement binds Mr. White in his
individual capacity. As such, he cannot be individually liable for breaches of the Agreement. As
regards, Plaintiffs' alter ego/veil piercing claims, the Kentucky statute refers to an immunity
exception for "negligence, wrongful acts, or misconduct." These terms encompass extra-
contractual and/or tortious conduct. The analysis here is limited to Mr. White and Counts I and
II, which allege breaches of the Agreement, wherein Mr. White was not a party. There are no
claims in Counts I and II asserted against Mr. White for negligence, wrongful acts, or
misconduct. Further, Plaintiffs have neither offered sufficient evidence nor directed the Court's
attention to evidence that would meet the criteria to subject Mr. White to liability. Therefore, as
regard alter ego/veiling piercing, there are no questions of material fact germane to Mr. White's
personal liability under Counts I and II.

---

[1] For purposes of assessing alter ego liability, Kentucky recognizes no distinction between
corporations and limited liability companies. *Hodak v. Madison Capital Mgmt., LLC*, 348 F.
App'x 83, 94 (6th Cir. 2009)

Accordingly, Defendants' Motion for Summary Judgment, as regards claims against Mr. White under Counts I and II, will be granted.

    2.   Defendant Ambassador

        a.   Count I

Ambassador argues that it cannot be liable for breach of contract under Count I because it performed all of its obligations under the Agreement.  Namely, Ambassador maintains that it was not required to form a captive insurance company under the Agreement. Therefore, the alleged failure to form a captive insurance company cannot serve as a basis for a breach of contract. Plaintiffs argue that both Addendum A and B of the Agreement require that Ambassador form an insurance captive.  Ambassador contends that the Agreement does not expressly state that "Ambassador is required to form a captive insurance company."

Paragraph 3 of the Agreement states, "Ambassador will perform services for AE Paper described in Addendum A and B of this Agreement." (ECF No. 24-1 at p. 2).    Under Addendum A, "Implementation" is defined to include the following:

> • Implementation will be commenced as directed by AE Paper. The decision is being made by AE Paper to form a captive, AE Paper and Ambassador will consider the options for selection of an appropriate captive structure and Ambassador will assist AE Paper in the following.

>> 1.   Implementation includes:

>> i.      Incorporation of the captive

>> ii.      Selection of the appropriate vendors for the captive (legal, banking, audit, actuarial, administration, investment management, etc.)

>> iii.    Licensing of the captive by the selected domicile to operate as an insurer.

>> iv.    Setting up the accounting functions for the captive.

      v.      Preparing the final business plan for the licensing application.

      vi.     Formulating and implementing the captive structure (e.g. underwriting, guidelines, investment strategy, claims management, etc.) including meeting with regulators and any other person or persons who may be involved in the approval and licensing requirements for captive insurers.

*Id*. at p. 8. Addendum B provides, in relevant part, in the "Implementation" phase of the

Agreement

It is anticipated that the services provided by Ambassador outlined in Addendum A will adhere to the following time frame:

**90 Days <u>Estimated</u> For Completion of Feasibility and Implementation**

\*\*\*

**Implementation**

| Task | Subject to |
|---|---|
| Incorporation of the Captive | Written confirmation for movement to Implementation by AE Paper |
| Preparation of the Final Business Plan | Reinsurance and Fronting Approval |
| Formulating and Implementing the Captive Structure | Approval from Regulators |
| Licensing of the Captive by the Selected Domicile to Operate as an Insurer | Business Plan Approval from Regulators |

*Id*. at p. 9.

Under Kentucky law, the elements of a breach of contract claim are that: (1) the parties

made a valid contract; (2) the contract was breached; (3) the claimant performed under

the contract; and (4) the claimant suffered damages as a result of the breach. *Webster & Assocs.,*

*Inc. v. EagleBurgmann KY, Inc.*, No. 12-206-WOB-JGW, 2013 WL 6210263, at \*5 (E.D. Ky.

Nov. 27, 2013) (citing Ky. Prac. Elements of an Action § 4A:1). "The determination whether a material breach has occurred is generally a question of fact answered by weighing the consequences of the breach in light of the customs of performance attendant to similar contracts." *Hodak v. Madison Capital Mgmt., LLC*, 348 Fed.Appx. 83, 90 (6th Cir. 2009). It is elementary that a contract is not breached unless the non-performance is substantial or material. *Fay E. Sams Money Purchase Pension Plan v. Jansen*, 3 S.W.3d 753, 757 (Ky.App.1999).

Here, the parties have presented competing facts as to whether Ambassador fulfilled its obligations under the Agreement. Ambassador maintains that it performed under the Agreement by:

(1) assisting AE Paper in gathering financial data to be used in developing a captive program model;

(2) engaging a third-party actuary for completion of actuarial studies;

(3) preparing and exploring captive program models;

(4) communicating with various insurance and reinsurance professionals;

(5) designing three captive programs to be presented to AE Paper; and

(6) obtaining property insurance within the appropriate limits of coverage as desired by AE Paper.

(ECF No. 38 at p. 13). In their briefing, Plaintiffs do not dispute Ambassador's enumerated performance. Likewise, the parties do not dispute that a captive was not formed. Rather, the key disputes lie with whether the Agreement required Ambassador to form a captive and/or whether the failure to form a captive constituted a breach of the Agreement. Ambassador's contention that the Agreement does not expressly state that it was required to form a captive insurance company fails to consider the significance of Addendum A and B. The tasks listed in the Implementation phase, directly relate to incorporation and licensing of a captive, which support

12

Plaintiffs' argument that the claimed duties were within the scope of the Agreement.  As such, there are questions of fact as to the parties' intent and duties under the Agreement.  Thus, the Court cannot find as a matter of law that Ambassador is not liable for breach of contract under Count I.

Accordingly, Defendants' Motion for Summary Judgment, as regards Ambassador under Count I, will be denied.

b.   Count II

Ambassador next argues that it cannot be liable for breach of contract under Count II because it performed all of its obligations under the Agreement.  Ambassador maintains that the obligations alleged to have been breached, in Count II, were not duties under the Agreement. In Count II, Plaintiffs allege 1) that "Ambassador represented to AE PAPER that [it] would procure $13 million dollars in property insurance for AE PAPER through an off-shore insurance captive," 2)  that "[o]n behalf of Ambassador, White agreed with AE PAPER that for $948,690.00 Ambassador would procure $13 million dollars in insurance coverage with a premium cost of $425,690.00, and $523,000.00 would be returned to AE PAPER to be placed in a loss fund," and 3) that "Ambassador breached that agreement by failing to procure $13 million in insurance coverage."  (ECF No. 24 at ¶¶ 50-52).  Ambassador maintains that these additional alleged promises are inadmissible parol evidence because of the Agreement's integration clause. Further, Ambassador maintains that, even if these Count II averments were not subject to the Agreement's integration clause, such agreement would constitute a second contract, and that, any such second contract lacks consideration. Plaintiffs contend that Mr. White acknowledged these terms and obligations and confirmed the same in correspondence with Mr. Seltzer.

The Agreement's integration clause, at paragraph 12, provides in relevant part, as

follows:

> This Agreement constitutes the entire understanding and agreement between AE Paper and Ambassador with regard to its subject matter and supersedes all other prior agreements and understanding, whether written or oral, between AE Paper and Ambassador concerning such subject matter. This Agreement may not be changed or modified except by agreement in writing signed by the parties.

(ECF No. 24-1 at p. 5).  Under Kentucky contract law[2], a merger and integration clause does not prohibit the parties from future agreements to modify or even to rescind the contract. *Energy Home, Div. of S. Energy Homes, Inc. v. Peay*, 406 S.W.3d 828, 834 (Ky. 2013).  "The power to modify or rescind a preexisting agreement is coextensive with the power to initiate it; either is an incident of contractual capacity. This rule prevails, though the contract recites that no modification shall be made except in writing." *Vinaird v. Bodkin's Adm'x*, 254 Ky. 841, 72 S.W.2d 707, 711 (1934) (citations omitted). Further, Kentucky courts have recognized:

> that parties who have the right to make a contract have the power to unmake or modify, regardless of self-imposed limitations; that by subsequent agreement based upon a sufficient consideration parties may modify their contract in any manner they choose; and that generally a new consideration is required in order for an attempted modification for a contract to be valid.

*Id*.

In most circumstances, "[t]he question of the existence of a contract is a question of fact for the jury to answer." *Audiovox Corp. v. Moody*, 737 S.W.2d 468, 471 (Ky. Ct. App. 1987). Whether a contract is an accord or novation is a question of intent appropriate for resolution by the trier of fact. *Am. Dairy Queen Corp. v. Fortune St. Rsch. & Writing Inc.*, 753 F.

---

[2] In addressing Count II, Defendants cite to Kentucky law as they believe that the Agreement, which contains a Kentucky choice of law provision, governs the integration clause.  Plaintiffs, in responding to Defendants' Count II arguments, cite to no case law and do not appear to challenge Defendants' utilization of Kentucky law.  Thus, the Court will presume that Kentucky law applies regardless of whether the averments in Count II are embodied in the Agreement or a subsequent contract.

Supp. 2d 675, 680 (W.D. Ky. 2010).

Here, under the Agreement and the principles outlined above, the question becomes whether the allegations related to the procurement of $13 million of insurance represented the parties' intent to change, modify, novate, amend, and/or substitute[3] the Agreement, or to create a second separate contract.   The record presents factual questions as to the intent of the parties, the scope of said obligations, and their relatedness or unrelatedness to the subject matter of the Agreement. Such questions are best left to the factfinder.   Therefore, Ambassador's Motion for Summary Judgment as to Count II will be denied.

As regards Defendants' lack of consideration argument, the record reflects that AE Paper was to pay a premium cost of $425,690 with $523,000 returned for a loss fund.  Depending upon the final terms of agreement, such bargained for exchange may satisfy the element of consideration.  Therefore, Defendants' Motion for Summary Judgment, based upon a lack of consideration, presents factual questions for the jury.

Accordingly, Defendants' Motion for Summary Judgment, as regards Ambassador under Count II, will be denied.

B.  Count III-Breach of Contract

Seubert contends that Defendants, Ambassador Group LLC and Brandon White, agreed to compensate it for its losses arising out of the parties' disputes. Specifically, Seubert maintains the parties entered into a legally enforceable contract as evidenced by text messages confirming the terms, date, and time, wherein Seubert accepted Mr. White's offer to pay $300,000 to settle Seubert's claims against Mr. White and Ambassador.  Plaintiffs contend that Mr. White and Ambassador failed to pay the promised $300,000, thereby breaching the settlement agreement.

---

[3] These terms are not meant to be exclusive or exhaustive list of contractual principles.

Defendants argue Count III fails because, 1) there was no contract between Seubert and

Defendants, 2) Seubert does not identify or reference any information as to when or how the

parties manifested an intention to be bound by the agreement, 3) Seubert does not provide any of

the agreement's required material terms, and 4) Seubert does not identify any consideration from

Seubert to Defendant.  Further, Defendants contend that the law does not support Seubert's

position that it is a third party or intended beneficiary.

As regards Defendants' argument, that Seubert cannot assert that it is third-party or

intended beneficiary of the Agreement, the same is irrelevant to an analysis of Count III.  In

support of their contentions, Defendants maintain that Seubert responded to written discovery as

follows:

**Interrogatory No. 18**

Identify and describe the contract that Ambassador or White had with Seubert
which forms the basis for Seubert's breach of contract claim as described in
Paragraphs 51 to 56 of the Complaint.

**ANSWER: Seubert is an Insurance Brokerage firm who has had a business
relationship for some time with Defendants' Ambassador and White. Seubert
refers select client needs to the Defendants relying upon the Defendants to
provide professional services to them, as it did in this case. Although Seubert
is not named as a party, it is an intended third-party beneficiary of the
Captive Services Agreement.**

(ECF No. 39 at pp. 318-319).  Defendants misconstrue Seubert's response.   Interrogatory

Number 18 refers to Paragraphs in Count III of the Complaint, not Count III of the Amended

Complaint.   The referenced paragraphs in Count III of the Complaint do not include averments

as regards Ambassador and/or White's alleged failure to pay $300,000 to Seubert, whereas said

averments do appear in Count III of the Amended Complaint.  Moreover, the response to

Interrogatory Number 18 itself indicates that Seubert only views itself as intended or third-party

beneficiary with regard to the Agreement.  Count III of the Amended Complaint references an alleged contract, (a settlement agreement), outside of the Agreement.  Therefore, neither Count III of the Amended Complaint nor the record in discovery support that analysis or decision of Seubert's status an intended/third-party beneficiary vis-à-vis the Agreement is necessary to the disposition of Count III.

The Court will now turn to the issue as to whether Defendants and Seubert entered into the alleged settlement agreement.  Under Kentucky law[4], the general requirements for any contract are offer and acceptance, full and complete terms, and consideration. *Cantrell Supply, Inc. v. Liberty Mutual Insurance Co.*, 94 S.W.3d 381, 384 (Ky.App.2002). Elements for a breach of contract require proof of the existence of a contract, of a breach of that contract, and that the breach caused damages.  *EQT Prod. Co. v. Big Sandy Co., L.P.*, 590 S.W.3d 275, 293 (Ky. Ct. App. 2019)

The elements of an enforceable contract under Pennsylvania law are: (1) a manifestation of an intent to be bound by the terms of the agreement, (2) sufficiently definite terms, and (3) an agreement supported by adequate consideration. *See Johnston the Florist, Inc. v. Tedco Constr. Corp.*, 441 Pa.Super. 281, 657 A.2d 511, 516 (Pa.Super.1995).  To prove a breach of contract under Pennsylvania law, a plaintiff must establish "(1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract[,] and (3) resultant damages." *Ware v. Rodale Press, Inc.,* 322 F.3d 218, 225 (3d Cir.2003); *see also Lynchburg Steel, Inc. v. O'Neill Props. Grp., L.P.,* No. 09–4704, 2010 WL 4909941, at *2 (E.D.Pa. Dec.1, 2010). Typically, the question of "whether an undisputed set of facts establishes a contract is one of law." *Buff v. Fetterolf*, 207 Pa.Super. 92, 215 A.2d 327, 330 (1965). However, "[w]here the

---

[4] Again, the parties do not advocate which state law should prevail here.

facts are in dispute, the question of whether a contract was formed is for the jury to decide."

*Ingrassia Constr. Co., Inc. v. Walsh*, 337 Pa.Super. 58, 486 A.2d 478, 482 (Pa.Super.1984).

Here, Mr. Long testified that he asked Mr. White to pay Seubert the sum of $600,000.00

to compensate Seubert to resolve the issues and avoid Plaintiffs filing formal claims against

Defendants. Mr. White testified that he told Mr. Long that he was only able to pay $300,000.00,

and that he or Ambassador would wire money to Seubert to resolve the issues.  Mr. White further

testified as follows:

> Q. Did you have any communications with Brian Long that involved you or Ambassador sending money to Seubert and AE Paper to resolve the issues that are the matter of this lawsuit?
>
> A. I did, yes.
>
> Q. What did you discuss?
>
> A. So Brian, I believe Brian initiated the conversation around him obtaining the other cover, the additional coverage from EC3, and that they were out of money because they went ahead and bound that cover, and we were in discussions around whether we want to be made whole -- something to this effect, I'm summarizing, and I believe that Brian and I had a professional and personal relationship that I wanted to -- I wanted to make it right, and we had a lot of other -- we had other lawsuits going on. I thought that because of their commitment to me, Brandon Mueller and Brian Long would stick with me throughout that, and so I wanted to work to make it right without accepting any liability or admitting fault in some way, but I wanted to try to make it right.
>
> Q. And along those lines, did you offer to pay them a sum of money?
>
> A. He asked for a -- and to the best of my knowledge he asked for a specific amount, and I told him that I would work to get it done.
>
> Q. And did you tell him that you were going to send them the money?
>
> A. I believe I did because I was actively trying to secure the funds to do so.

(ECF No. 36-2 at p. 16).  Mr. White further testified as follows:

> Q. And so you would agree that you said that you would attempt to get that money and send it to him to resolve the differences that we're dealing with in this

lawsuit; is that correct?

A. I would say that I was trying to make it right, and I would try to find those funds, make it right in his mind so –

Q. And did you ever send those funds?

A. No, I didn't. He cut off communication to file a lawsuit before I could secure them.

*Id*.

Brian Long and Brandon White exchanged text messages from July 30, 2020 until October 2, 2020. On September 22, 2020, at 3:31 p.m., Mr. White sent the following text message to Brian Long: "Brian, still awaiting response from my banker to confirm funds will be in Ambassador account on Thursday. Just keeping you in the loop. I will let you know in the next hour, in all likelihood. Just wanted to keep communication open you updated." *Id*. at p. 31. On September 22, 2020, at 4:55 p.m., Mr. Long replied: "What did your bank say?" Mr. White responded: "They are confirming but doesn't look like funds will be available until Friday." *Id*. Mr. Long then sent a text to Mr. White, stating: "I need confirmation by noon tomorrow or you will force me to go another direction which involves insurance commission and attorneys." *Id*. at p. 32. Mr. White responded: "Confirmation of funds in the account? I am already agreeing to pay the amount…. I am just trying to figure out if it is on Thursday or Friday." *Id*. Mr. Long followed up with a text to Mr. White, stating: "Your word is fine with me for today. Will the funds be wired by noon on Friday?" *Id*. Mr. White confirmed that the funds would be wired, responding with a text stating: "At the latest. It may be available Thursday. That's all I'm seeking confirmation on." *Id*.

The record and context of the above places neither party in a prime position for summary judgment on Count III. Despite Defendants' arguments relative to contract formation and

consideration, the record contains sufficient evidence that a factfinder could find a contract

formation with adequate consideration.  The testimony of Mr. White indicates his intent to give

Seubert $300,000 consideration to resolve AE Paper and Seubert's legal claims against him

and/or Ambassador. The record can support a finding of a promise to pay $300,000. There is

evidence to support a condition precedent and there is evidence to support no condition

precedent that financing be secured.  The record also presents the question discussed between the

parties about the timing of payment from Defendants' bank. While the context of the record

could support a promise to pay and a potential breach, the full scope of terms of and clarification

of who were parties to the settlement agreement claimed in Count III involve questions of fact.

Accordingly, both Plaintiffs' and Defendants' respective Motion for Summary Judgment,

as regards Count III, will be denied.

C.  Counts IV and V-Fraud and Fraud in the Inducement; Count VI-Conversion

Defendants argue that Counts IV, V, and VI, all torts, should be dismissed under the gist

of the action doctrine, because Plaintiffs' claims are "inextricably intertwined" with Plaintiffs'

breach of contract claims (Count I and II).   Plaintiffs maintain that its claims for Fraud and

Fraud in the Inducement, Counts IV and V, are collateral to the Agreement; and thus, the gist of

the action does not bar its claims.  Plaintiffs have not presented opposition in Defendants'

arguments relative to the Count VI Conversion claim.

Applicability of the gist of the action doctrine depends upon the source of the duties at

issue. The question of import is whether a duty arises from the contract, or whether it is a societal

or tort duty.  The Agreement at issue in this case expressly provides for the application of

Kentucky law; however, the parties have only cited to Pennsylvania law in their gist of the action

arguments.  Regardless of whether Kentucky law or Pennsylvania law is applied, the gist of the

action principle is recognized in each state, and in each state, the result would be the same.

Under Pennsylvania law, the Gist of the Action Doctrine prevents an ordinary contract claim from being recast as a tort claim. *See Bruno v. Erie Ins. Co.*, 106 A.3d. 48, 68-69 (Pa. 2014) (explaining that the Gist of the Action Doctrine is concerned with whether the essential foundation for a lawsuit is based in tort or contract). In general terms, tort actions are based upon breaches of duties imposed by law as a matter of social policy, while contract actions are based on breaches of duties imposed by "mutual consensus agreements between particular individuals." *Bash v. Bell Tel. Co.*, 601 A.2d 825, 829 (Pa. Super. 1992). Pennsylvania Courts have previously recognized four circumstances where the Gist of the Action Doctrine will properly bar a putative tort claim:

> 1. The Tort Claim arises solely from a contract between the parties;
> 2. The duties allegedly breached were created and grounded in the contract itself;
> 3. The liability stems from a contract; or
> 4. The tort claim essentially duplicates a breach of contract claim or the success of the tort claim is wholly dependent on the terms of a contract.

*See eToll Inc. v. Elias/Savion Adver., Inc.*, 811 A.2d 10, 19-21 (Pa. Super. 2002).

Similarly, "under Kentucky law, the failure to perform a contractual obligation typically does not give rise to a cause of action in tort." *Cap. Holdings 234, LLC v. Advoc. Consulting Grp., PLLC*, No. 1:17-CV-00023-GNS, 2017 WL 3816721, at *3 (W.D. Ky. Aug. 31, 2017) (citing *Ronald A. Chisholm, Ltd. v. Am. Cold Storage, Inc.*, No. 3:09-CV-00808-CRS-JDM, 2012 WL 5362306, at *3 (W.D. Ky. Oct. 31, 2012)). However, " '[i]f a plaintiff can establish the existence of an independent legal duty, then he may maintain an action in tort even though the acts complained of also constitute breach of contract.' " *Chisholm*, 2012 WL 5362306, at *3 (quoting *Mims v. W.S. Agency, Inc.*, 226 S.W.3d 833, 836 (Ky. Ct. App. 2007)). Where contract claims are merely "repackaged" as tort claims and the defendant owes no duty independent of a

contract, a plaintiff may not maintain a tort action. *See Nelson v. Columbia Gas Transmission, LLC*, 808 F. App'x 321, 330 (6th Cir. 2020).

In that regard, a claim for fraud in the inducement cannot be predicated on nonperformance of a contractual obligation. *Mario's Pizzeria, Inc. v. Fed. Sign & Signal Corp.,* 379 S.W.2d 736, 740 (Ky.1964). Fraud in the inducement applies where a party fraudulently induces another to enter into a contract; however, it must "concern[ ] matters extraneous to the contract's terms." 37 Am.Jur. 2nd Fraud § 270. *See also Derby City Capital, LLC v. Trinity HR Servs.,* 949 F.Supp.2d 712, 727 (W.D.Ky.2013).   Thus, a fraud claim, which is entirely predicated upon the mere failure to perform a contractual obligation in not cognizable under Kentucky law.

Here, Plaintiffs Fraud and Fraud in the Inducement claims, Counts IV and V, contain the same factual allegations as in its Breach of Contract Claim. Plaintiffs assert no duty independent from the duties contained within the Agreement itself.  The crux of Plaintiffs' Fraud and Fraud in the Inducement claims are that AE Paper would not have entered into the Agreement if it had known that Defendants would not perform pursuant to the material terms of the Agreement. Under such logic, any party seeking a breach of contract claim could also claim that they never would have entered a contract if they had known the breaching party would not perform the duties created by the contract.   The claims in Counts IV and V present breaches related only to contractual duties and contractual performance.  Plaintiffs have neither averred nor produced any evidence of any extracontractual representation to present any basis to find any independent tort duty.  As such, under Pennsylvania and Kentucky law, Plaintiffs' tort claims for fraud and fraud in the inducement, Count IV and V, are precluded by the gist of the action.

AE Paper's, Count VI conversion claim, is based upon AE Paper's assertions that it did

not receive the benefit of the bargain from the Agreement because AE Paper paid $50,000 to Ambassador to meet its obligations under the Agreement. This conversion claim, Count VI, falls within the purview of the Agreement; therefore, there is no separate tort claim.  Thus, under either Kentucky or Pennsylvania law, Count VI is also barred by the gist of the action doctrine.

Since this Court has found that the record supports summary judgment that Mr. White was not a party to the Agreement, discussion of the gist of the action doctrine is necessary in relation to its application to bar recovery against a non-party to the Agreement.  Despite Mr. White's status as a non-party, the gist the action would also bar recovery and liability against him for tort claims in Counts IV, V, and VI. In *Williams v. Hilton Grp. PLC*, 93 F. App'x 384, 387 (3d Cir. 2004), the Third Circuit addressed whether the gist of the action doctrine barred tort claims against defendants who were not parties to the contract at issue. *Id.* The district court in *Williams* had dismissed the plaintiff's tort claims, under the gist of the action doctrine, against a defendant who was not a party to the contract at issue. *Id.* The Third Circuit affirmed, stating that "As the Pennsylvania courts have spelled out, the gist of the action doctrine bars tort claims against an individual defendant where the contract between the plaintiff and the officer's company created the duties that the individual allegedly breached." *Id.* Since *Williams*, numerous district courts within the Third Circuit have held that the gist of the action doctrine bars tort claims against non-parties to the contract if the defendants acted merely as agents or employees of the entity that was a party to the contract. *Furniture Sols. & Res. V. Symmetry Office*, LLC, No. 15-cv-4774, 2015 U.S. Dist. LEXIS 170790 (E.D. Pa. Dec 22, 2015) (holding that the gist of the action doctrine precludes tort claims against agents of corporate defendant because claims arose from corporate defendant's underlying breach of contract); *Integrated Waste Solutions, Inc. v. Goverdhanam*, No. 10-cv-2155, 2010 WL 4910176 at *12, 2010 U.S. Dist. LEXIS 127192 at

*37 (E.D. Pa. 2010) (holding that the gist of the action doctrine barred plaintiff's fraud, intentional misrepresentation, and negligent misrepresentation claims against the individual defendant, who served as the CEO of corporate defendant, despite the lack of contractual relationship with the individual defendant, because the CEO's misrepresentations concerned the subject matter of the contract between the plaintiff and the company).  Here, the lack of a contractual relationship between Mr. White, individually, and AE Paper would not change the outcome.  The source of the duties lies with the Agreement and not a separate and distinct tortious act.  And as discussed in Section III.A, Plaintiffs have produced no evidence or testimony to suggest that Mr. White should be individually liable under Counts I and II for the breach of the Agreement.  It follows then that Plaintiffs have also not demonstrated that individual liability would arise under the tort claims.

Accordingly, Defendants' Motion for Summary Judgment, as regards Counts IV, V, and VI, will be granted in favor of  Defendants and against Plaintiffs

D.  Count VII-Punitive Damages

Defendants finally argue that they are entitled to summary judgment on Count VII because punitive damages are not a distinct and separate claim.  Plaintiffs have offered no argument in opposition.

Under both Kentucky and Pennsylvania law, punitive damages may not be pleaded as separate causes of action.  A claim for punitive damages is not a separate cause of action, but a remedy potentially available for another cause of action. *Toon v. City of Hopkinsville*, 2011 WL 1560590, at *3 (W.D.Ky. April 14, 2011) (citing *Salisbury v. Purdue Pharma, L.P.*, 166 F.Supp.2d 546, 548, n. 1 (E.D.Ky.2001). "A request for punitive damages does not constitute a cause of action in an[d] of itself. Rather, a request for punitive damages is merely incidental to

a cause of action." *Nix v. Temple Univ. of Com. Sys. of Higher Educ.*, 596 A.2d 1132, 1138 (Pa. 1991) (citing *Feingold v. SEPTA*, 517 A.2d 1270 (Pa. 1986) ).

Here, Count VII of the Amended Complaint pleads Punitive Damages as a distinct cause of action.   Such cannot be sustained.  Moreover, as all tort claims will be dismissed, punitive damages cannot be awarded.

Accordingly, Defendants' Motion for Summary Judgment, as regards Count VII, will be granted.

IV.      Conclusion

Based upon the foregoing and for the reasons stated above, Defendant, Mr. White's, Motion for Summary Judgment as to Counts I and II will be granted.  Defendants' Motion for Summary Judgment will be granted as to Counts IV, V, VI, and VII and denied as to Counts I, II, and III.  Plaintiffs' Motion for Summary Judgment as to Count III will be denied.  A separate order will issue detailing the disposition.

**SO ORDERED** this 30th day of December 2022.

Marilyn J. Horan
United States District Judge